**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

Eric Moon, Sr., et al.,                        :
                                               :
     Plaintiffs,                          :
                                               :
     v.                                   :        CIVIL ACTION NO.
                                               :        1:13-cv-02396-WCO
Officer Eric Shinholster, Individually         :
and in His Official Capacity, *et al.,*        :
                                               :
                                               :
     Defendants.                          :

## ORDER

This matter is before the court on Defendants' unopposed motion for summary judgment [20].

**I.      Background**

**A.      Procedural History and Facts**

On July 18, 2013, Plaintiffs, Eric Moon, Sr. and Ruby Banks, surviving parents, filed suit against Defendants, Officer Eric Shinholster, Lieutenant James Van Ness, and Officer Clinton Denson, alleging constitutional violations arising out of an attempted traffic stop and pursuit which eventually resulted in the death of Eric Moon, Jr.  The parties engaged in discovery.  Plaintiffs' counsel noticed the depositions of Defendants but then withdrew that notice less than a week later.  It is not clear to the court whether Plaintiffs took any

discovery, and Plaintiffs did not file an opposition to Defendants' motion for summary judgment.

As the motion for summary judgment is unopposed, the court draws the facts from Defendants' unopposed statement of material facts, which itself is compiled from affidavits of the officers responding to the incident, including Defendants.  On July 20, 2011, around 4 p.m., Cobb County Police Officers Denson and Green were on patrol and observed a gray Chevy Lumina on Bentley Road in Marietta.  Officer Denson believed that car had illegal window tint.  The officers pulled in behind the vehicle as it proceeded on Terrell Mill Road.  The officers lit their emergency lights and attempted to initiate a traffic stop, but the Chevy Lumina did not pull over and continued down Terrell Mill Road, eventually pulling into the entrance of the Lincoln Hills apartment complex.  The vehicle slowed and then quickly accelerated, entering the parking lot at a high rate of speed and causing the driver to lose control and the car to flip over.

The driver of the vehicle (later identified as Eric Moon) got out of the vehicle and began to flee on foot.  Officers Green and Denson pursued on foot and lost sight of Moon around the 1900 building of the apartment complex.  Other officers responded to the scene and investigated the car.  A paper license belonging to Eric Dwayne Moon, Jr. was found near the car.  The license plate of the car was checked and showed the registered owner as Larreezo Cooper, who resided in the Lincoln Hills complex.

2

Officers Swift and Shinholster went to Cooper's apartment and knocked on the door. There was no answer.  As the officers turned away from the door, they ran into Cooper, who confirmed that he owned a Chevy Lumina.  Cooper told the officers he believed his car had been stolen and he was out looking for it.  Cooper told the officers he did not think there was anyone in his apartment but gave them permission to search.  Rather than searching at that time, the officers took Cooper back to the scene of the accident to confirm that the car was his.  Cooper again told the officers they could search his apartment and that there should not be anyone there.

Lt. Van Ness and Officers Denson, Swift, Shinholster, Green, and Sneed, as well as K-9 Officer Blakeney, all proceeded to Cooper's apartment and opened the door.  Officer Blakeney had his dog bark while he announced, "police," and asked anyone to exit the apartment.  Officer Blakeney again announced, "police," and asked anyone to come out. There was no response.  The other officers then entered the apartment, announcing, "Cobb County police."  They began to search the apartment from front to back, announcing their presence in each room.

The last bedroom in the back of the apartment was locked with a light on inside.  Lt. Van Ness forced the door open and entered the bedroom with Officers Shinholster, Swift, and Denson.  Lt. Van Ness again announced, "Cobb Police, Come out!"  The room itself

AO 72A
(Rev.8/82)

was cleared by Van Ness, Shinholster, Swift, and Denson except for a walk-in closet with a closed door.

Officers Denson and Shinholster covered the door while Lt. Van Ness opened it. As he opened the door, Lt. Van Ness immediately saw a male standing in the back of the closet holding a pistol in his right hand by his side. Lt. Van Ness announced the presence of the gun and flung the door open. Officer Shinholster, standing to Lt. Van Ness's left, loudly commanded that the subject drop the weapon. Officer Denson heard the words, "There he is, Gun!" as the door opened.

Officer Denson saw what he thought was splintered wood from near the closet door and saw Lt. Van Ness bend backward and to the right. Although he did not hear a shot, due to Lt. Van Ness's physical reaction, Officer Denson believed a shot had been fired from within the closet.

As Lt. Van Ness opened the door, Officer Shinholster also saw the subject standing in the back of the closet holding the gun down by his side. Officer Shinholster commanded: "Drop the gun and get on the ground!"

Moon, however, raised the gun toward the officers, and Officer Shinholster fired four or five shots, which caused Moon to move toward the back corner of the closet, but he was still standing with the gun. Officer Shinholster moved and fired again. He saw Moon fall to a seated position, but he still held the gun. Moon raised the gun toward the officers again.

4

While all of this was happening, Officer Denson saw the gun pointed in his direction. He saw Moon remain standing after Officer Shinholster fired his shots, and Officer Denson then fired several more rounds toward Moon. After Officer Shinholster fired his second round of shots, Officer Denson observed that Moon had been hit but he was still holding the gun while bent over in the closet.

Officer Denson gave additional verbal instructions for Moon to drop his gun, and Moon did not comply. Officer Denson again fired toward Moon. Lt. Van Ness then heard Officer Shinholster commanding, "Don't go for that," and "Drop the gun." Moon fell into a seated position in the closet with the weapon still in his hand but resting on his knee. Moon raised the gun a third time, and Officer Denson fired again. After those rounds, Moon dropped the weapon to the floor, and no additional deadly force was used against Moon.

Lt. Van Ness never fired his weapon due to the angle at which Moon was in the closet and the positions of Officers Denson and Shinholster. When Lt. Van Ness entered the closet after the shots had been fired, Moon's hand was around the gun with his index finger curled like he was actually holding the gun. Van Ness kicked the gun away from Moon and called for medical assistance. Cobb County paramedics confirmed Moon was dead at the scene. The distance between Moon and the officers when they opened the door was approximately ten feet.

5

**B.     Contentions**

Defendants argue the court should grant their motion for summary judgment because Defendant Van Ness did not use force at all during the incident; Defendants Denson's and Shinholster's use of force was not excessive; all Defendants are entitled to qualified immunity for Plaintiffs' federal claims and official immunity for their state law claims; Plaintiffs' state law claims against Cobb County are barred by sovereign immunity; and Defendant Cobb County Police Department's customs and policies did not play a role in any alleged constitutional violations.

Plaintiffs have not responded to Defendants' motion for summary judgment, and the court deems it unopposed.

**II.     Discussion**

**A.     Constitutional Violation/Qualified Immunity**

In *Jean-Baptiste v. Gutierrez*, 627 F.3d 816 (11th Cir. 2010), the Court of Appeals discussed a Fourth Amendment constitutional claim of excessive deadly force.  There, an officer was chasing Jean-Baptiste and his co-felon when the officer came upon Jean-Baptiste waiting to ambush him behind a building.  *Id.* at 821.  The officer opened fire and continued shooting even after Jean-Baptiste had fallen to the ground.  *Id.*  In considering the plaintiff's claim of excessive deadly force, the court stated:

> It is well settled that courts must account "for the fact that police officers are often forced to make split-second judgments—in circumstances

6

that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). Although suspects have a right to be free from force that is excessive, they are not protected against a use of force that is "'necessary in the situation at hand.'" *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002) (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1186 (11th Cir. 2001)). "Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396, 109 S.Ct. at 1871–72. To determine if the use of force exceeded that which is necessary, courts are required to balance carefully "'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id.* at 396, 109 S.Ct. at 1871 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985) (internal quotation marks omitted)).

        Any use of force must be reasonable. *Id.* at 395, 109 S.Ct. at 1871. Reasonableness is dependent on all the circumstances that are relevant to the officer's decision to use deadly force, including the seriousness of the crime, whether the suspect poses an immediate danger to the officer or others, whether the suspect resisted or attempted to evade arrest, and the feasibility of providing a warning before employing deadly force. *Penley*, 605 F.3d at 850. Perspective also is crucial to the analysis: "[t]he only perspective that counts is that of a reasonable officer on the scene at the time the events unfolded." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009); *see also Graham*, 490 U.S. at 396, 109 S.Ct. at 1872 (explaining that a "standard of reasonableness at the moment applies").

*Id.* at 820-21; *see also Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010) (noting that Fourth Amendment "reasonableness" must take into consideration police officers forced to make "split second judgment – in circumstances that are tense, uncertain, and rapidly evolving").

"The Supreme Court has also explained that where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Clark v. City of Atlanta*, 544 F. App'x 848, 855 (11th Cir. 2013) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see also McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1246 (11th Cir. 2003) ("because the Constitution permits the use of deadly force to prevent a violent suspect from escaping, the Constitution must also permit the use of deadly force against a suspect who poses not merely an escape risk (because he is not yet in police control), but also an imminent threat of danger to a police officer or others").

"Regardless of whether [the suspect] had drawn his gun, [his] gun was available for ready use, and [the officer] was not required to wait 'and hope [] for the best.'" *Jean Baptiste*, 627 F.3d at 821 (quoting *Scott*, 550 U.S. at 385)). "The law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007); *Garcyznski*, 573 F.3d at 1168-69 (refusal to comply with repeated commands to show one's hands, drop a cell phone, and drop a weapon justify "escalation into deadly force"). Furthermore, a police officer is "entitled to continue his use of force until a suspect thought to be armed is 'fully secured.'" *Jean-Baptiste*, 627 F.3d at 821 (quoting *Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009)).

8

Here, although Moon's initial offense of tinted windows was not severe, his subsequent flight, reckless driving, flipping of the car, and refusal to comply with the officers' commands to drop his weapon that was pointed at the officers substantially increased the level of the crimes at issue. Further, Moon actively resisted arrest. Moreover, based on the only evidence in the record before the court, Moon certainly posed an immediate threat to all of the officers who entered Cooper's apartment. It is undisputed that when the officers confronted him, Moon was armed and hiding in a closet in an apartment he did not have permission to enter and that Moon refused to obey the instructions and warnings of the officers to come out and drop his weapon. Moon pointed the weapon at the officers and did not drop his arm down until after the officers had fired multiple times. The court concludes based on the facts in the record that any reasonable officer in Defendants' shoes would have believed Moon to be gravely dangerous.

In any event, Defendant Officers would be entitled to qualified immunity if they "reasonably could have believed that probable cause existed, in light of the information they possessed," to shoot Moon, even if that belief was mistaken. *See Garczynski*, 573 F.3d at 1167. The officers' use of force is judged objective, and they are shielded from liability "unless application of [that] standard would inevitably lead every reasonable officer in [their] position to conclude the force was unlawful." *Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993).

9

**B.      Municipal Liability**

The claims against the three officer Defendants in their official capacities are really claims against Cobb County.  In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court held that municipalities (and other local government entities) are "persons" within the meaning of 42 U.S.C. § 1983. The Court, however, consistently has declined to hold municipalities liable under a theory of respondeat superior.  *See*, *e.g.*, *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986).  Rather, a plaintiff must demonstrate a municipal "policy" or "custom" that caused the plaintiff's injury in order to establish a municipality's liability.  *See, e.g.*, *Canton v. Harris*, 489 U.S. 378, 389 (1989).  The plaintiff must also show that "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged."  *Board of Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

To impose liability on Cobb County for violating a constitutional right under section 1983, Plaintiffs must show (1) that their constitutional rights were violated; (2) that Cobb County had a policy or custom that constituted a deliberate indifference to their constitutional rights; and (3) that the violation was caused by the policy or custom.  *See Canton*, 489 U.S. at 388; *see also Grech v. Clayton County*, 335 F.3d 1326 (11th Cir. 2003) (plaintiff has two methods by which to show policy: "identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county").

10

In *Wayne v. Jarvis*, 197 F.3d 1098 (11th Cir. 1999), *overruled on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003), the court further explicated the standard for establishing municipal liability.  "[A] plaintiff seeking to impose liability on a municipality under § 1983 [must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  *Id.* at 1105 (quotations and citations omitted).  "A custom is a practice that is so settled and permanent that it takes on the force of law."  *Id.*  "To establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice.  Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the municipality."  *Id.*; *see also Depew v. City of St. Marys*, 787 F.3d 196 (11th Cir. 1986) ("Normally, random acts or isolated incidents are insufficient to establish a custom or policy.").  "A plaintiff must show that the municipal action was taken with the requisite degree of culpability, i.e., that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences."  *Davis v. DeKalb County Sch. Dist.*, 233 F.3d 1367, 1375-76 (11th Cir. 2000).

Plaintiffs' claim for municipal liability fails because Plaintiffs cannot establish a constitutional violation.  Even if the court assumes, however, that Plaintiffs stated a constitutional violation, Plaintiffs have alleged no officially promulgated policy or custom of Cobb County that caused their injuries.  In their complaint, Plaintiffs allege only that Defendants were acting in accordance with Cobb County policies and that they were not

11

properly trained or supervised.  These bare allegations do not show that any unspecified Cobb County policy or lack of training caused deliberate indifference to Plaintiffs' constitutional rights or that any alleged constitutional violation was caused by any Cobb County custom.

### C.      State Law Claims

Plaintiffs allege state law claims of assault, battery, and wrongful death.  The doctrine of official immunity provides limited protection from suit to government officers and employees sued in their personal capacities. *See Gilbert v. Richardson*, 264 Ga. 744, 750 (1994).  Municipal officers "are subject to suit only when they negligently perform or fail to perform their 'ministerial functions' or when they act with actual malice or intent to cause injury in the performance of their 'official functions.' " *Id.* at 753 (citing Ga. Const., art. I, § 2, ¶ 9(d)).

"In the context of a shooting by a police officer, the Supreme Court of Georgia has held that if the officer shot 'intentionally and without justification, then [he] acted solely with the tortious actual intent to cause injury' and would not be protected by official immunity." *Porter v. Massarelli,* 303 Ga. App. 91, 96 (2010) (quoting *Kidd v. Coates,* 271 Ga. 33, 34 (1999)). "If, however, the officer shot 'in self-defense, then [he] had no actual tortious intent to harm ..., but acted only with the justifiable intent which occurs in every cause of self defense, which is to use such force as is reasonably believed to be necessary

12

to prevent death or great bodily injury to themselves or the commission of a forcible felony.'" *Id.* (citing *Kidd,* 271 Ga. at 34).

Here, as the court found above, the amount of force used by Defendants was not constitutionally unreasonable given the circumstances faced by the officers. Therefore, the court finds Plaintiffs cannot show that Defendants' actions were not justified.[1]

## III.  Conclusion

The court GRANTS Defendants' unopposed motion for summary judgment and leave to file excess pages [20].

The Clerk of the Court is DIRECTED to enter judgment for the Defendants.

**IT IS SO ORDERED** this 15th day of September, 2014.

s/*William C. O'Kelley*
WILLIAM C. O'KELLEY
SENIOR UNITED STATES DISTRICT JUDGE

---

[1]Any state law claims against Cobb County (that is, those against the officers in their official capacities) are barred by sovereign immunity.  *See*, *e.g.*, *Presnell v. Paulding County*, 454 F. App'x 763, 769 (11th Cir. 2011) (for state law claims, sovereign immunity bars plaintiff's suit against Paulding County); *Effingham County v. Rhodes*, 307 Ga. App. 504, 504-05 (2010) ("The doctrine of sovereign immunity protects governments from legal action unless they have waived their immunity from suit.  The immunity, at least for counties, may only be waived by a legislative act which specifically provides that sovereign immunity is waived and the extent of such waiver.").

13